Filed 12/18/15  P. v. Navarro CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>MARCO ANTONIO NAVARRO,<br><br>  Defendant and Appellant. | F065680<br><br>(Super. Ct. Nos. VCF187188,<br>VCF217254A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Brett R. Alldredge, Judge.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Ryan B. McCarroll, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On retrial in 2012, a jury convicted Appellant Marco Antonio Navarro of first degree murder, dissuading a witness by threat, and auto theft. The trial court sentenced Navarro to 31 years eight months to life in prison. He was also sentenced to a consecutive two-year term in another case in which he pled nolo contendere to assault and admitted a gang allegation.

On appeal, Navarro argues reversal of the judgment is required because the trial court erroneously admitted into evidence hearsay documents, a statement made by Navarro during a counseling session, evidence of a subsequent crime committed by Navarro, the testimony of an unqualified expert, and the former testimony of a witness who was not available. He also contends the trial court made instructional and sentencing errors; that the prosecutor committed misconduct by placing inadmissible evidence before the jury; and that his conviction for the assault was time barred by the statute of limitations. We conclude Navarro is entitled to have a restitution fine and a stayed parole revocation restitution fine reduced, but otherwise affirm.

## STATEMENT OF THE CASE[1]

In March of 2008, an information in case No. VCF187188 charged Navarro with the June 2007 murder of Tony Jimenez (Pen. Code, § 187, subd. (a)), forcibly dissuading witness K.J. (Pen. Code, § 136.1, subd. (c)(1)), and grand theft of an automobile (Pen. Code, § 487, subd. (d)(1)). The information further alleged Navarro personally used a deadly weapon (a knife) in the commission of both the murder and the witness dissuasion (Pen. Code, § 12022, subd. (b)(1)).

*First Trial*

In November 2008, a jury convicted Navarro on all counts, found the murder to have been in the first degree, and found the deadly weapon allegations true. The court

---

[1]     We take judicial notice of the appellate record in our case No. F056935 (Evid. Code, §§ 452, 459). All further statutory references are to the Evidence Code unless stated otherwise.

sentenced Navarro to an aggregate term of 30 years eight months to life in prison.  It imposed a $2,000 restitution fine (Pen. Code, § 1202.4, subd. (b)), and a restitution order payable to Jimenez's family in the amount of $10,547.39 (Pen. Code, § 1202.4, subd. (f)).

In September 2010, on direct appeal, this Court modified Navarro's presentence custody credits and affirmed the judgment in all other respects.  However, in later habeas corpus proceedings, this Court issued an order to show cause returnable in the superior court as to whether Navarro received effective assistance of counsel at trial.  In December 2011, the superior court found Navarro had not received effective assistance of counsel and issued an order reversing his convictions.

*Second Trial*

At Navarro's second trial in July 2012, a jury again convicted Navarro on all counts, found the murder to have been of the first degree, and found the deadly weapon allegations true.

The court sentenced Navarro to an aggregate term of 31 years eight months to life in prison, this time adding a second one-year enhancement for personal use of a weapon.  It imposed a $10,000 restitution fine (Pen. Code, § 1202.4, subd. (b)), a $10,000 parole revocation restitution fine (Pen. Code, § 1202.45), and a restitution order payable to Jimenez's family in the amount of $12,547.39 (Pen. Code, § 1202.4, subd. (f)).

Navarro timely appealed.

*2009 Jail Assault*

Earlier, in February 2009, Navarro was charged with felony assault by means of force likely to produce great bodily injury on a fellow inmate at the Tulare County jail (Pen. Code, § 245, subd. (a)(1)), and a further allegation alleged the act was done for the benefit of, at the direction of, or in association with a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(A)).  The alleged offense took place January 16, 2009, eight days after the superior court imposed the original judgment in case No. VCF187188.

3.

In June 2012, before the second trial, Navarro pleaded nolo contendere and admitted the street gang allegation in the 2009 jail assault case. In July 2012, the court sentenced Navarro to four years in prison. Following Navarro's second trial and conviction later that month in case No. VCF187188, the court resentenced him to a consecutive subordinate term of two years in prison.

On April 17, 2013, this court issued an order granting Navarro's request to construe his notice of appeal from the judgment in case No. VCF187188 (the 2008 case) as also being from the judgment in case No. VCF217254A (the 2009 case). However, this court denied without prejudice Navarro's additional request for leave to file an otherwise untimely request for a certificate of probable cause.

## STATEMENT OF FACTS

In 2007, Navarro, two months shy of his 17th birthday, lived in a Visalia group home for troubled adolescents. He had a bedroom to himself. Fellow residents K.J. and E.D. shared a bedroom down the hall from Navarro, while S.B. and another resident shared a third bedroom. The residents participated in group counseling. At one counseling session, Navarro said his favorite holiday was Halloween because he could wear a mask and stab people.

Tony Jimenez began working at the group home around June 2007. He was pursuing a master's degree and had previously worked in another group home, in juvenile hall, and in a hospital with special education students. Jimenez was five feet eight inches tall and weighed about 220 pounds; Navarro was about five inches shorter than Jimenez.

Landon Meeks, who worked at the group home, trained Jimenez on the practices and procedures of the group home. For instance, staff members were to report the status and conduct of the residents in a logbook; they were to write an incident report using a standardized form if a resident broke a house rule; and they were not allowed to use physical force on residents. The residents were not allowed to have weapons, and staff members were to store all knives and other sharp objects in the office safe. Staff

4.

members had access to a group home van, but were to keep the keys in their immediate possession.

On June 24, 2007, Jimenez worked the overnight shift by himself for the first time. His duties included enforcing bedtime and periodically checking to see that the residents remained in their bedrooms. Staff member James Hunt worked the preceding shift and was preparing to leave when Jimenez arrived. Before Hunt left, he heard a "disagreement" between Jimenez and Navarro about bedtime. Specifically, Hunt heard Jimenez tell Navarro "[t]o go back to his room." Navarro was uncooperative and said something like "I don't want to go back." When Hunt asked Jimenez if everything was okay, Jimenez said yes, but that Navarro was "just a little out of line right now." Hunt stayed at the house until "everything was fine" and then left.

K.J. was watching a movie in S.B.'s bedroom when Jimenez told everyone they needed to get to bed once the movie was over. K.J. later heard an argument between Navarro and Jimenez in the kitchen. Soon after, K.J. saw Navarro sitting on his own bed.

After watching television by himself in the living room, E.D. heard an argument between Navarro and Jimenez in the kitchen about Navarro wanting to watch more television rather than go to bed. E.D. heard Navarro cuss at Jimenez a couple of times and say something like, "you're not the boss of me."

About 15 to 20 minutes after Hunt left, he returned to retrieve something he left behind and saw Jimenez sitting by himself at a table. The house was quiet and it seemed that all of the residents were in their bedrooms.

At 10:32 p.m., Jimenez called Luis Jauregui, a child care worker who was slated to be promoted to manager of the group home the following day, and asked him what the procedure was for addressing Navarro's refusal to go to bed. Jauregui told Jimenez to leave Navarro alone and write an incident report.

Later that night, K.J. woke to the sound of a fight between Navarro and Jimenez in the bedroom K.J. shared with E.D. The two appeared to be wrestling and punching each

5.

other. Navarro appeared to be holding a knife. Jimenez eventually ran out of the bedroom, down the hall and out the front door. Navarro followed him outside. Jimenez yelled for help, but soon fell silent.

Navarro came back into the house, pointed a knife at K.J. and told him the same thing that happened to Jimenez would happen to him if he said anything. Navarro then drove away in the group home van. K.J. walked outside and saw Jimenez's body lying in a flower bed near the front of the house. A subsequent autopsy revealed Jimenez had been stabbed 92 times, including a fatal stab which severed an artery on the right side of his neck.

Police arrived at the scene at approximately 1:00 a.m. on June 25 and discovered the ground around Jimenez's body "saturated with blood." There was an arc of blood on the exterior wall of the house above the body. Police Detective Curtis Brown opined that the arc of blood had been cast off "a hand or something that's being held in a person's hand" while "making a forward and back motion."

Inside the house, police found an abundance of blood in the hallway and in K.J. and E.D.'s bedroom. Detective Brown opined the deposits of blood in the bedroom confirmed that it had been the scene of a fight. He also opined the direction of blood deposits revealed the source of the blood started in the bedroom before traveling down the hall and out of the house.

Four deposits of blood were found on Navarro's bed. DNA tests revealed that three set of deposits belonged to Navarro exclusively. The fourth set of deposits contained a mixture of blood that could have belonged to both Navarro and Jimenez, with Jimenez likely being the major contributor. Detective Brown opined that, from the appearance of the deposits, the blood belonging exclusively to Navarro had been transferred to the sheet through direct contact, while the mixture of blood possibly belonging to both Navarro and Jimenez had fallen onto the sheet as droplets.

6.

A logbook (Exhibit 73) found in the doorway of S.B.'s bedroom included entries by Jimenez that he was at the group home at 10:00 p.m.; all residents were in their rooms at 10:30 pm.; and all residents were asleep at 11:00 p.m., except Navarro, who was sitting on his bed.

A spiral bound notebook (Exhibit 74) and an incident report (Exhibit 75) were found on the dining room table. The notebook contained a signed statement from Jimenez describing how Navarro reacted profanely when Jimenez turned off the television, bumped shoulders with Jimenez, and "again" threatened him while leaving S.B.'s bedroom. The statement concluded that Navarro "has an extre[me] anger problem which should be addressed." The incident report similarly stated that, when Jimenez turned off the television, Navarro said something to him like, "You better watch your back, you fucking punk."

The morning after the killing, former resident J.A.[2] called the owner of the group home, Esah Ribadu, and asked if everything was okay. Several days later, J.A. told Ribadu that Navarro had asked him for a ride prior to the killing. When J.A. contacted Navarro and told him he could not find him a ride, Navarro said "not to worry about it. That he had it handled."

The evening after the killing, California Highway Patrol officers found the group home van abandoned on a freeway in San Diego County with an empty fuel tank. Border patrol agents arrested Navarro in late October of 2007 when he tried to reenter the United States from Mexico.

During an interview following his arrest, Navarro told Detective Brown everything was "going good" until Jimenez started working at the group home. According to Navarro, Jimenez would say Navarro "was a bitch and this and that." The insults triggered memories of how Navarro's stepfather and his mother's other boyfriend

---

[2] J.A. had run away from the home a couple of weeks before the murder.

would often hit him. Navarro told J.A. he was going to run away "if they didn't take out that fool."

Navarro told Detective Brown that, on the night of the killing, Jimenez came into his bedroom and started slapping and punching him in the face. Navarro grabbed a knife he kept hidden by his bed and used it to stab Jimenez in the neck. Navarro followed Jimenez into K.J. and E.D.'s bedroom where he continued to stab Jimenez. Navarro then followed Jimenez outside and continued to stab him in the neck, back and stomach. Navarro explained that he got "too mad and took [the knife] out and started sticking him, sticking him until he just didn't move no more." Navarro then took the keys from Jimenez's pocket, gathered some clothes, and drove away in the van.

Navarro told Detective Brown he had been previously convicted of a misdemeanor for resisting arrest and being intoxicated, that he had been in juvenile hall for three months, and that he had been arrested for hitting someone in the head while he was in a different group home.

Deputy Miguel Franco testified that in January 2009, about a year and a half after killing Jimenez, Navarro punched a fellow inmate in the head with a closed fist after approaching the inmate from behind while the inmate was watching television.

*Defense Evidence*

Navarro testified in his own defense that his mother was 14 years old when he was born; he never met his father and did not know what happened to him; he and his mother and brothers moved to Mexico; his mother's boyfriend lived with them in Mexico and spanked him "with objects"; he ran away when he was 13 because of his mother's boyfriend's treatment of him; his mother got into "trouble" at some point and went to jail; his mother's boyfriend tried to molest his sister; and he later lived with his grandmother but got into trouble and ended up in a group home. Navarro acknowledged he has had "problems getting in fights" since he was young, but did not know, most of the time, why the fights happened.

Clinical and neuropsychologist Edwin Ortiz-Nance, Psy.D, examined Navarro and diagnosed him as having reactive attachment disorder. Dr. Ortiz-Nance explained that patients with the disorder believe that the world is "a scary place" and an "unsafe place," and "the only person who is going to get me through it is me." Patients with the disorder are "[v]ery hypervigilant," "very controlling" and "see people as objects."

Dr. Ortiz-Nance opined that an argument between a hypothetical patient like Navarro and a new caregiver like Jimenez would trigger an "assault cycle" in which "[l]ittle things build up" until there is "an explosion," at which point "[a]ll you can do is watch it burn." If the patient believes that "one of us has to come out on top," the patient is "going to wait for his shot. Whatever it is that happens then, he's going to have to go for it."

**DISCUSSION**

I. ADMISSION OF RECORDS JIMENEZ PURPORTEDLY WROTE SHORTLY BEFORE HIS DEATH

Navarro claims the trial court violated both the hearsay rule and his right to confrontation under both the United States and California constitutions by admitting three records Jimenez purportedly wrote shortly before his death: entries in the group home logbook (Exhibit 73); writing in a group home notebook (Exhibit 74); and a group home incident report (Exhibit 75) (separately referred to as the logbook, notebook and incident report). We address the hearsay claim separate from the constitutional confrontation clause claim, but find no merit in either.

*Procedural Background*

At trial, the prosecutor sought to introduce into evidence the entries in the logbook, the writing in the notebook, and the incident report for the truth of the matters asserted. The prosecutor argued that logbook entries and the incident report each satisfied the exception to the hearsay rule for business records under section 1271, and

9.

the notebook writings and incident report each satisfied the exception for threat of infliction of injury under section 1370.

Defense counsel argued that the writing had not been authenticated and that neither the notebook writing nor the incident report satisfied the threat-of-injury exception. He argued the notebook writing was written in a way "that makes [Jimenez's] point. That includes all the bad facts and none of the good facts." He also argued that incident report which stated Jimenez should "watch [his] back" was "too vague and attenuated."

The trial court ruled that the logbook satisfied the business records exception. It also ruled the notebook writing satisfied the threat of injury exception, finding that the totality of statements "bring it within an [au]ra of credibility." The court further found the incident report satisfied the exception for both a business record and for threat-of-injury exception, believing the wording constituted a threat and that incident reports were, as testified to by the supervisor of the home, kept in the regular course of business.

*Hearsay Rule*

The hearsay rule prohibits the admission of "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (§ 1200, subd. (a).) Of import here, exceptions to the hearsay rule include section 1271, the business record exception, and section 1370, the threat of infliction of injury exception.

Navarro contends that trial court erred by finding that the entries in the logbook were admissible under the business records exception to the hearsay rule; that the writing in the notebook was admissible under the threat of infliction of injury exception to the hearsay rule; and that the incident report was admissible under both the business records and threat of infliction of injury exceptions.

10.

*1. Standard of Review*

"A trial judge is vested with wide discretion in determining whether a proper foundation has been laid for admission of business records under the business records exception." (*People v. Zavala* (2013) 216 Cal.App.4th 242, 245.) The same is true for the threat of infliction of injury exception. (*People v. Quitiquit* (2007) 155 Cal.App.4th 1, 9.) A trial court's ruling that evidence is admissible under an exception to the hearsay rule "implies whatever finding of fact is prerequisite thereto." (§ 402, subd. (c).)

On appeal, a reviewing court will reverse a trial court's ruling that evidence satisfied the foundational requirements for an exception to the hearsay rule "only if the court clearly abused its discretion." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1011; see *People v. Zavala, supra,* 216 Cal.App.4th at pp. 245-246.) "When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.) The fact that another court might have ruled differently "reveals nothing more than that a reasonable difference of opinion was possible. Certainly, it does not establish that the court here 'exceed[ed] the bounds of reason ….' [Citation.]" (*People v. Clair* (1992) 2 Cal.4th 629, 655.)

*2. The Business Records Exception*

Navarro contends the trial court erred by finding Jimenez wrote the logbook entries and incident report "in the regular course of business," within the meaning of section 1271, subdivision (a). We disagree.

Section 1271 provides:

"Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies

11.

to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

At trial, Jauregui, who was a child care worker and then manager at the group home, testified that, while on duty at the group home, staff members were to make entries into the logbook around the clock on what the residents were doing. Jauregui made entries every 15 minutes. He identified Exhibit 73 as the logbook the staff members used. Staff member Meeks testified that there was a logbook containing "an hourly tracking of what the clients were doing for each hour of the day." Meeks trained Jimenez in "how to log." Staff member Hunt also identified Exhibit 73 as being the logbook which staff members would "put notations of what the clients were doing" "throughout the day" and "around the clock" "hourly or every half hour."

"'Whether a particular business record is admissible as an exception to the hearsay rule … depends upon the "trustworthiness" of such evidence, a determination that must be made, case by case, from the circumstances surrounding the making of the record. [Citations.]" (*People v. Matthews* (1991) 229 Cal.App.3d 930, 939.) "The foundation for admitting the record is properly laid if in the opinion of the court, the sources of information, method, and time of preparation were such as to justify its admission." (*People v. Williams* (1973) 36 Cal.App.3d 262, 275.)

Although Jauregui, Hunt and Meeks differed as to whether the entries were to be made in intervals of 15, 30, or 60 minutes, they nonetheless described the intervals as being regular. A trial court may consider business records to be trustworthy even if they contain "some omissions" (*People v. Hovarter, supra,* 44 Cal.4th at p. 1011) and even though an employee "did not perform the task in precisely the same manner every time and may have failed to do it all in some instances" (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 323).

12.

The trial court did not abuse its discretion in finding that sufficient foundation was laid to establish the admissibility of the logbook entries under the section 1271 business records hearsay exception.

There was also substantial evidence to support the trial court's finding that the incident report was properly admitted under the business records exception. Staff member Jauregui identified Exhibit 75 as being a form staff members used to write an incident report "whenever a [resident] didn't follow the rules properly." He advised Jimenez to write such a report when Jimenez asked him what the procedure was for addressing Navarro's refusal to go to bed. Staff member Hunt also identified Exhibit 75 as being a form staff members used "[a]s part of the course of business" to write incident reports whenever a resident "broke house rules or became unruly." Group home owner Ribadu confirmed that it was "a common occurrence" for the residents to "get written up for being argumentative, defiant."

Nonetheless, Navarro, relying on *Palmer v. Hoffman* (1943) 318 U.S. 109 (*Palmer*), argues that the incident report in question was not made as "a matter of routine" but rather "sufficiently unusual" because Jimenez did not know how to make one. He also argues there was no testimony whether the incident reports became an automatic part of a resident's file once written, and if and where they were they maintained. Moreover, Navarro contends the incident report in question was unfinished and had not been submitted to the custodian of records.

In *Palmer* the Supreme Court held that a written statement covering the cause of an accident made by the engineer of a train, who died before trial, was not admissible under the federal version of the hearsay rule because it was not made as part of the "regular course' of the business" of the company. (*Palmer, supra,* 318 U.S. at p. 113.) Instead, it was an "accident report" and not "typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to

provide internal controls." (*Ibid*)  Indeed, the accident report's "primary utility is in litigating, not in railroading." (*Id.* at p. 114.)

We find Navarro's reliance on *Palmer* unavailing.  The group home in the present case was responsible for counseling troubled minors and housing them 24 hours a day.  In order to maintain a continuity of care and counseling, each shift of staff members would need to know about incidents occurring during the other shifts.  Although some incidents could lead to progressive discipline, there is nothing to suggest that the primary purpose of the reports was for litigation purposes rather than in housing and counseling the residents.

Navarro also argues the incident report did not meet the regulatory criteria because "[t]he incident in question was not one required to be reported to the licensing authority under existing group home regulations."  However, the incident report at issue here was not admitted as an official record but rather as a business record.  There is no suggestion in the business record exception that it applies only to governmentally compelled records. (§§ 1270, 1271, 1280.)

The trial court did not abuse its discretion in finding sufficient foundation was laid to establish the admissibility of the incident report under the section 1271 business records hearsay exception.

Navarro further contends that, even if the entries in the logbook and incident report were made in the regular course of business, the trial court erred by finding that the "sources of information and method and time of preparation were such as to indicate [their] trustworthiness" within the meaning of section 1271, subdivision (d).

"The key to establishing the admissibility of a document made in the regular course of business is proof that the person who wrote the information or provided it had knowledge of the facts from personal observation." (*Jazayeri v. Mao, supra,* 174 Cal.App.4th at p. 322; see also *People v. Hovarter, supra,* 44 Cal.4th at p. 1012 ["So long as 'the person who originally feeds the information into the process [has] firsthand

14.

knowledge,' the evidence can … qualify as a business record."].)  Here, Jimenez had firsthand knowledge of the facts stated in the logbook and incident report and wrote both close in time to the observations he recorded.

Thus, the trial court did not abuse its discretion in finding sufficient indicia of trustworthiness to submit the notebook and incident report into evidence pursuant to section 1271.

### 3.  *The Threat of Injury Exception*

Navarro also contends the trial court erred by finding the threat of infliction of injury exception pursuant to section 1370 applied to the notebook writing and the incident report.  We disagree.

Section 1370 provides an exception for threats of infliction of injury, in part, as follows:

> "Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met: [¶] (1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant. [¶] (2) The declarant is unavailable as a witness pursuant to Section 240. [¶] (3) The statement was made at or near the time of the infliction or threat of physical injury.  Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section. [¶] (4) The statement was made under circumstances that would indicate its trustworthiness. [¶] (5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official."  (§ 1370, subd. (a).)

The admitted incident report states that, when Jimenez first turned off the television, Navarro said something like, "You better watch your back, you fucking punk." The writing in the notebook recounts the circumstances surrounding the incident as follows:

> "I asked Marcos [*sic*] to turn of[f] the TV he said why are you treating me like a punk.  I then turned of[f] the TV and he said, 'I aint no bitch you fucken punk, suck my dick, what happened did you get fucked when you were a kid. [']  He kep[t] up his pro[f]anities for the next hour."

15.

Although the writing in the notebook does not recount the threat specifically, it does state that, when Jimenez later told Navarro to leave S.B.'s bedroom, Navarro bumped shoulders with Jimenez, called him a "fucken punk" and "again threatened" him.

Considering the notebook writing and the incident report together, the trial court could reasonably have found that the notebook writings described or explained the initial threat of physical injury to Jimenez he recorded in the incident report. As such, the notebook writings and incident report "purport[] to narrate, describe, or explain the infliction or threat of physical injury upon the declarant" within the meaning of section 1370, subdivision (a)(1).

Navarro contends that, even if the notebook writings and incident report narrated, described, or explained a threat of physical injury, the trial court erred by finding that they were "made under circumstances that would indicate [their] trustworthiness" within the meaning of section 1370, subdivision (a)(4). Section 1370, subdivision (b) states:

> "For purposes of paragraph (4) of subdivision (a), circumstances relevant to the issue of trustworthiness include, but are not limited to, the following: [¶] (1) Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested. [¶] (2) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive. [¶] (3) Whether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section."

Here, there is no evidence Jimenez's statements were made in contemplation of litigation, but instead to record an incident which occurred while he was on duty at the group home. Nor is there any basis for believing Jimenez's statements were inaccurate or that he had a motive to lie. Finally, Jimenez's statements, which were made very near the time of his death, were substantiated by other admissible evidence. Before he left the group home, staff member Hunt, who worked the shift preceding Jimenez, heard a "disagreement" between Jimenez and Navarro about bedtime. Specifically, Hunt heard Jimenez tell Navarro "[t]o go back to his room." Navarro was uncooperative and said

something like, "I don't want to go back." When Hunt asked Jimenez if everything was okay, Jimenez said yes, but that Navarro was "just a little out of line right now."

K.J., who was watching a movie in S.B.'s bedroom when Jimenez told everyone they needed to get to bed once the movie was over, later heard an argument between Navarro and Jimenez in the kitchen. E.D. also heard an argument between Navarro and Jimenez in the kitchen about Navarro wanting to watch more television rather than go to bed. E.D. heard Navarro cuss at Jimenez a couple of times and say something like, "you're not the boss of me."

At 10:32 p.m. on the night in question, Jimenez called Jauregui, manager of the group home, and asked him what the procedure was for addressing Navarro's refusal to go to bed. Jauregui told Jimenez to leave Navarro alone and write an incident report.

Later that night, K.J. woke to the sound of a fight between Navarro and Jimenez in K.J.'s bedroom. The two appeared to be wrestling and punching each other and Navarro appeared to be holding a knife. Jimenez eventually ran out of the bedroom, down the hall, and out the front door. Navarro followed him. Jimenez started yelling for help, but soon fell silent. When Navarro came back into the house, he pointed a knife at K.J. and told him that the same thing that happened to Jimenez would happen to him if he said anything.

In contrast to Navarro's case, in *People v. Quitiquit, supra,* 155 Cal.App.4th 1, circumstances of trustworthiness were not found when a wife's statement that her husband had twisted her neck was made to an officer seven weeks after the neck injury. Nothing indicated the statement was not made in contemplation of litigation, and the statement was not substantiated by other evidence. In addition, the wife spent substantial time with her children after injury, providing opportunity to contrive the story, and she was in a partially "incoherent" state when she made the statement. (*Id.* at pp. 11-12.)

17.

Here, the trial court did not abuse its discretion in finding sufficient indicia of trustworthiness to submit the notebook writings and the incident report under section 1370.

*Confrontation Clause*

Navarro also contends that admitting the three exhibits into evidence violated his constitutional right to confrontation. We disagree.

The Sixth Amendment of the federal Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses. In *Ohio v. Roberts* (1980) 448 U.S. 56, 66, the United States Supreme Court construed that right as allowing the admission at trial of an out-of-court statement if it fell within a "firmly rooted hearsay exception" or had "particularized guarantees of trustworthiness." The high court overruled that decision 24 years later in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). There, the court created a general rule that the prosecution may not rely on "testimonial" out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Id.* at pp. 59, 68.)

Although the *Crawford* court did not define the term "testimonial," it made these observations:

> "[T]he text of the Confrontation Clause … applies to 'witnesses' against the accused – in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.… [¶] Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' … 'extrajudicial statements … contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the

statement would be available for use at a later trial.'" (*Crawford, supra,* 541 U.S. at pp. 51-52.)

The *Crawford* court "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial'" (*Crawford, supra,* 541 U.S. at p. 68), and has not done so in the subsequent decade. Nevertheless, in *People v. Dungo* (2012) 55 Cal.4th 608, the California Supreme Court observed that "testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Id.* at p. 619.)

Here, assuming Navarro has not forfeited the constitutional issue by failing to raise it below, we nonetheless find his argument without merit. The logbook, which was accepted into evidence under the business records exception, is by its "nature … not testimonial." (*Crawford, supra,* 541 U.S. at p. 56.)

As for the notebook and incident report, neither were made with the degree of formality or solemnity required to be considered testimonial. (*People v. Dungo, supra,* 55 Cal.4th at p. 619.) They certainly were not the product of a custodial interrogation or were not similar to sworn affidavits, depositions, or prior testimony. (See *Williams v. Illinois* (2012) 132 S.Ct. 2221, 2242 (plur. opn. of Alito J.).) Nor does the "primary purpose" of the notebook or incident report pertain in some fashion "to a criminal prosecution." (*People v. Dungo, supra,* at pp. 619, 621 [autopsy report was not testimonial because it had "several purposes, only one of which was criminal investigation"]) Here, Jimenez's statements in the notebook and incident report were primarily done for purposes of further care and counseling of the group home residents.

Navarro's argument that the exhibits were testimonial for purposes of the confrontation clause is without merit.

## II. DID THE TRIAL COURT ERR WHEN IT ADMITTED EVIDENCE OF NAVARRO'S PRIOR STATEMENT ABOUT STABBING PEOPLE?

Navarro contends the trial court erred when it admitted unduly prejudicial evidence under section 352 that, two weeks before the murder, he told fellow group home residents during a group counseling session that Halloween was his favorite holiday because "he got to wear a mask … and stab people." Navarro argues in the alternative that, even if the statement was admissible under section 352, it was privileged and confidential information that should not have been allowed. While Navarro acknowledges that he did not raise the issue of privilege or confidentiality below, thereby forfeiting that issue on appeal, we will address the issue on the merits because Navarro further claims counsel was ineffective for failing to make the objection. We find no prejudicial error.

*Procedural Background*

Outside the presence of the jury, the prosecutor proffered evidence that staff member Meeks heard Navarro say, during a group counseling session two weeks prior to the murder, that his favorite holiday was Halloween because he got to wear a mask and stab people. Defense counsel objected, stating, "It's a poor choice of words on [Navarro's] part. I think it's irrelevant and it doesn't show any intent and it's prejudicial, 352. Something that just came out in a group meeting, group session that they're having."

The trial court found the evidence admissible, stating:

"Well it is prejudicial but it's also probative to the issue of … this young man's state of mind and that's what the People are trying to prove. That's what [defense counsel is] trying to disprove or to counter with your other evidence. The jury, I believe, can hear that if that's going to be his testimony and give it whatever weight they wish."

Thereafter, Meeks testified that, two weeks prior to Jimenez's murder, the residents were sitting around the group home kitchen table during a counseling session

and talking about favorite holidays.  Navarro said Halloween was his favorite holiday "because he got to wear a mask and … stab people."

*Section 352*

"Except as otherwise provided by statute, all relevant evidence is admissible." (§ 351.)  Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (§ 210.)  However, a trial court has discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (§ 352.)

Undue prejudice is "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Holford* (2012) 203 Cal.App.4th 155, 167, italics omitted.)  In addition, "[e]vidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights.  Our high court has emphasized the word 'substantial' in section 352."  (*Ibid.*, citing *People v. Tran* (2011) 51 Cal.4th 1040, 1047 ["section 352 requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect."].)

"A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Navarro contends the trial court abused its discretion in finding his statement had probative value because the statement "was not related to the charged offense in any way."  We disagree.  As stated by the trial court, the statement was probative because Navarro's mental state during the stabbing was at issue.  Navarro told Detective Brown

21.

that he did not want to do anything to Jimenez, but that Jimenez kept hitting him, which made him "too mad" and he just started "sticking him until he just didn't move no more." Navarro's argument at trial was that he did not stab Jimenez with malice aforethought, but rather that he acted in imperfect self-defense due to the effects of his mental disorder. Navarro's prior statement that he liked Halloween because he got to stab people had a tendency to refute his claim of imperfect self-defense by suggesting that he did know and want to do what he was doing. The trial court did not abuse its discretion when it found the statement had probative value.

Nor did the trial court abuse its discretion in finding that the risk of undue prejudice did not substantially outweigh the probative value of Navarro's statement. His statement was not particularly inflammatory, especially in light of undisputed evidence that Jimenez was stabbed 92 times.

*Ineffective Assistance of Counsel*

Navarro contends that, even if his prior statement was admissible under section 352, it was privileged and confidential because it was made during a counseling session at the group home. Acknowledging that the issue was forfeited by defense counsel's failure to object on these grounds, Navarro contends counsel was ineffective for failing to do so. We disagree.

Navarro asserts defense counsel was deficient for failing to invoke the psychotherapist-patient privilege under section 1014, which provides, in part, that "the patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist." However, even assuming arguendo Navarro's statement was privileged, an objectively reasonable trial attorney could have easily believed Navarro's defense theory waived the privilege. The patient-litigant exception provides that the privilege does not apply if the patient has tendered an issue "concerning [his or her] mental or emotional condition." (§ 1016.) Navarro presented expert testimony that he

22.

had a mental disorder and did not kill Jimenez with malice aforethought because his mental disorder caused him to act in imperfect self-defense. Where a sound legal basis exists for the admission of evidence, an attorney is not ineffective for failing to object to its introduction. (*People v. Majors* (1998) 18 Cal.4th 385, 403.)

Navarro also asserts defense counsel was ineffective for failing to argue Navarro's prior statement was confidential pursuant to administrative regulations governing licensed group homes, specifically California Code of Regulations, title 22, section 80070, subdivision (c). Administrative regulations, however, cannot govern the admission of evidence at a criminal trial, and defense counsel was not ineffective for failing to object on those grounds. (See § 351 [relevant evidence is admissible except as otherwise provided "by statute"].)

In any event, even if the statement was improperly admitted, it was manifestly harmless. "[T]he application of ordinary rules of evidence … do[] not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of [*People v.*] *Watson* [(1956)] 46 Cal.2d [818, 836]." (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.) Similarly, a trial attorney's deficient performance warrants reversal only if "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

In these circumstances, it is not "reasonably probable that a result more favorable to the appealing party would have been reached" had this prior statement been excluded. (*People v. Watson, supra,* 46 Cal.2d at p. 836.) Again, Navarro's prior statement was not particularly inflammatory, especially when compared to undisputed evidence that Navarro stabbed Jimenez 92 times. Nor was there any evidence Navarro had actually stabbed anyone prior to Jimenez. It is highly unlikely that the jury rejected Navarro's claim of imperfect self-defense and found him guilty of murdering Jimenez in the first degree based on his prior statement.

We reject Navarro's claim of ineffective assistance of counsel.

## III. DID THE TRIAL COURT PROPERLY ADMIT EVIDENCE OF NAVARRO'S SUBSEQUENT ASSAULT WHILE IN PRISON?

Navarro contends the admission of evidence of his jailhouse assault on a fellow inmate 18 months after he killed Jimenez violated section 1101, subdivision (b) and deprived him of due process and a fair trial in violation of the United States and California Constitutions. Respondent argues the evidence was relevant on the issues of Navarro's intent for the murder and, more particularly, to rebut Navarro's claim of imperfect self-defense. We conclude the trial court did not err in admitting the evidence.

*Procedural Background*

Prior to the second trial in 2012, the prosecutor filed a motion in limine to admit evidence of Navarro's January 2009 jailhouse assault on a fellow inmate, which occurred 18 months after Navarro killed Jimenez. The motion argued the evidence was admissible for the limited purpose to show intent and lack of justification because Navarro allegedly attacked Ramos and Jimenez in the same manner, namely, by surprise attack.

At the hearing on the motion, the prosecutor reiterated the evidence was being offered to prove Navarro's intent and lack of justification. Defense counsel disputed the assumption that Navarro committed the attack on Jimenez by surprise, but that in any event, the jailhouse attack was too dissimilar to be probative because the inmate received no injuries, no weapon was used, the assault was done in conjunction with other people and was gang related, a "significant amount of time" had passed between the murder and the jailhouse assault, and the assault was not done in self-defense. The prosecutor countered that, despite defense counsel's claims to the contrary, both the murder and the assault contained "the element of surprise."

The trial court observed that *People v. Demetrulias* (2006) 39 Cal.4th 1, involving the admission of uncharged conduct to disprove a claim of self-defense, was "pretty close on point." It then ruled that evidence of the assault was admissible, explaining that

24.

"there's a prejudice that attaches to Mr. Navarro as attaches to any defendant in this circumstance; however, the probative value certainly appears to be consistent with the characteristic used in the scheme."

At trial, Deputy Miguel Franco testified that he was on duty at the detention facility on January 16, 2009, when he saw "an inmate" sitting on a bench watching television when Navarro came up from behind and struck him in the head with a closed fist, delivering a "hard blow."[3] Navarro, on cross-examination and in response to the prosecutor's question, agreed he had been convicted of the jailhouse felony assault with force likely to cause serious bodily injury. Neither party addressed the inmate attack in closing argument.

Navarro argues that trial court prejudicially erred in admitting evidence of the assault because "[n]othing about the jail assault and the homicide was similar," thereby negating any notion of a common design or plan to attack both the inmate and Jimenez by surprise. Respondent contends the prosecutor never argued the evidence was admissible for such a purpose, but instead the attack was admissible to rebut Navarro's claim of imperfect self-defense in Jimenez's murder.

*Applicable Law and Analysis*

It is well settled that evidence of a defendant's other criminal acts is not admissible to show he had the criminal disposition or propensity to commit the crime charged. (§ 1101, subd. (a).) To fall within the exceptions created by subdivision (b), the uncharged evidence must have a tendency to prove or disprove a disputed material fact and not merely be cumulative.[4] The trial court must also determine that its probative

---

[3] The jury was not informed that the jail assault was gang related or that there were other participants. Defense counsel successfully moved to preclude any reference to gang membership in Navarro's statement at the time of his arrest or with regard to the jail incident.

[4] Section 1101, subdivision (b) provides, in relevant part: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or

25.

value outweighs its prejudicial effect. (*People v. Alcala* (1984) 36 Cal.3d 604, 631-632, abrogated by statute on other grounds as stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 911.) Of particular relevance to this case, subdivision (b) has been interpreted to allow the admission of "other act" evidence which tends to negate a defendant's claim of self-defense. (*People v. Wells* (1949) 33 Cal.2d 330, 341-342.) In *Wells,* for instance, a defendant's prior malicious assault on a prison guard was admitted to negate his claim of self-defense with respect to the charged offense, also an assault on a prison guard. (*Ibid.*)

Thus, evidence of other crimes is admissible if relevant to prove a material fact at issue, separate from criminal propensity. (*People v. Daniels* (1991) 52 Cal.3d 815, 856.) "In order to satisfy the requirement of *materiality*, the fact sought to be proved may be either an ultimate fact in the proceeding or an intermediate fact 'from which such ultimate fact[] may be presumed or inferred." (*People v. Thompson* (1980) 27 Cal.3d 303, 315.) "Evidence of an uncharged offense offered to prove an intermediate fact is not necessarily material. The materiality requirement is satisfied *only* if the intermediate fact tends logically and reasonably to prove an ultimate fact which is in dispute." (*Id.* at p. 315., fn. 14.)

Navarro contends that the prosecutor's claim that both the assault and the Jimenez murder were committed in a certain way, i.e., by "surprise attack," was an intermediate fact which, in this case, did not prove an ultimate fact in dispute, namely intent.

A common design or plan is an intermediate fact. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1020.) In order to constitute a common plan or scheme, there must be "striking similarities" in the manner in which the misconduct was committed, i.e. whether the defendant committed similar distinctive acts of misconduct against similar victims under similar circumstances. (*Ibid*.)

---

other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident … ) other than his or her disposition to commit such an act."

Navarro contends no such common plan or scheme is present here because the assault was so dissimilar to the attack on Jimenez. He asserts the assault was, first and foremost, gang related, an assault committed at the direction of, in association with, or for the benefit of a criminal street gang, which makes it "completely unlike the personal conflict at issue in the [Jimenez] homicide." He also contends the assault involved multiple participants who were peers, while the homicide did not. He further contends the assault involved no weapon, whereas the homicide involved a knife. Finally, he contends there was no evidence that any conflict or dispute preceded the assault or that Navarro was acting in anger. Navarro is arguing, in essence, that the assault evidence was relevant only as character evidence, i.e., to show his propensity for crime, and hence inadmissible under section 1101, subdivision (a), which generally bars admission of character evidence to prove conduct on a specific occasion.

Respondent counters the evidence was never offered for the purpose Navarro now argues. Instead, according to respondent, the prosecutor offered the evidence to show that, assuming Navarro attacked both the inmate and Jimenez by surprise, the evidence of the assault was admissible to disprove Navarro's claim that the similar attack on Jimenez was partially justified based on imperfect self-defense.

Here, we find the evidence relevant for nonpropensity purposes, in particular, to show Navarro's intent and lack of justification, uses permitted by section 1101, subdivision (b). "'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394, fn. 2.) The California Supreme Court has "long recognized 'that if a person acts similarly in similar situations, he probably harbors the same intent in each instance.' [Citations.]" (*People v. Robbins* (1988) 45 Cal.3d 867, 879, superseded by statute on another ground as stated in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn.13.) Indeed, "'similar results do not usually occur through abnormal causes; and the recurrent of a similar result (here in the shape of an unlawful act) tends (increasingly with each

27.

instance) to negate accident or inadvertence or self-defense or good faith or other innocent mental state .…' [Citation.]" (*Id.* at p. 880.) Accordingly, "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*People v. Ewoldt, supra,* at p. 402.) The uncharged act need only "be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citation.]' [Citation.]" (*Ibid.*)

Notwithstanding the differences between the incidents Navarro identifies, the trial court could reasonably find the manner in which Navarro attacked the inmate was sufficiently similar to the manner in which he allegedly attacked Jimenez to support an inference that Navarro probably harbored the same intent in each instance. The prosecutor's theory was that Navarro attacked Jimenez by surprise from behind. The evidence of the jailhouse assault was that Navarro similarly attacked the inmate from behind while he was watching television. The recurrence of similar surprise attacks tended to disprove Navarro's claim that the surprise attack on Jimenez was done in self-defense. (See *People v. Robbins, supra,* 45 Cal.3d at p. 880.)

This is so despite Navarro's claim that he was prevented from arguing the lack of similarity between the two offenses because the jury was not aware (due to Navarro's request that they not be) that the jailhouse assault was gang related. Navarro does not explain how his association with a criminal street gang would have negated the affected common element of surprise.

In any event, assuming arguendo, the evidence should not have been admitted, reversal is not warranted because it is not reasonably probable exclusion of the evidence would have caused the jury to reach a different determination regarding the Jimenez murder. (See *People v. Malone* (1988) 47 Cal.3d 1, 22; see also *People v. Lopez* (2011) 198 Cal.App.4th 698, 716 ["the erroneous admission of other crimes evidence is harmless if it does not appear reasonably probable that without the error a result more favorable to the defendant would have been reached"].) The inflammatory nature of the evidence

28.

regarding Navarro's assault paled in comparison to the overwhelming evidence regarding the charged murder of Jimenez. (See *People v. Ewoldt, supra,* 7 Cal.4th at p. 405.)

In addition, at trial, prior to Deputy Franco's testimony, the trial court informed the jury that "this witness is being called for a limited purpose." During jury instructions, the trial court instructed that Deputy Franco's testimony, if believed, was not to be considered as showing Navarro's bad character or disposition to commit crime, but only for the limited purpose of deciding whether Navarro had a plan or scheme to commit the alleged current offense or that he lacked justification for the offenses alleged in the current case. Jurors are presumed to have followed the trial court's limiting instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

Furthermore, Navarro cannot now claim the limiting instruction was insufficient in its wording, because no request was made for a narrower instruction. (See *People v. Cowan* (2010) 50 Cal.4th 401, 479 ["[a]bsent a request, a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted."].)

In any event, the prosecutor never argued to the jury that they could, much less should, consider evidence of the assault for any purpose other than to determine whether the homicide was justified. (See *People v. Demetrulias, supra,* 39 Cal.4th at p. 18.)

We reject Navarro's claim that the admission of the assault evidence warrants reversal of his conviction.

IV. DID THE PROSECUTOR COMMIT MISCONDUCT BY REFERRING ON CROSS-EXAMINATION TO THE CONTENTS OF THE EXTRAJUDICIAL STATEMENTS NAVARRO'S EXPERT WITNESS CONSIDERED WHEN FORMING HIS OPINION?

Navarro contends the prosecutor committed prejudicial misconduct on cross-examination of defense expert Dr. Ortiz-Nance. We disagree.

*Procedural Background*

Prior to trial, the prosecutor, presumably without knowing whether Navarro would testify at trial, filed a motion in limine requesting Dr. Ortiz-Nance not be permitted to

29.

recount to the jury the statements Navarro made to him in an effort to explain the basis for his opinion that Navarro suffered from conduct disorder or reactive attachment disorder.

At the hearing on the motion, the gist of the People's argument was that Dr. Ortiz-Nance be allowed to testify that he formed his opinion about Navarro's condition by taking into consideration Navarro's police report or probation report, by talking to Navarro's family, and by talking to Navarro himself, but that he not be allowed to testify to specific statement's Navarro made, i.e., that the jury not be allowed to hear Navarro's hearsay statements. The trial court agreed, stating Dr. Ortiz-Nance "obviously based his opinion on certain things" and there was no problem if the source of that opinion was Navarro, but the "problem" manifested itself if Dr. Ortiz-Nance "starts to describe in detail for the jury facts that were told to him by Mr. Navarro as if they were facts." The trial court then stated it would need to take Dr. Ortiz-Nance's testimony question by question: "He will be allowed to identify his sources. He will be allowed to summarize the information that was given to him. He will not be allowed … as a starting point to simply go through an[] interview and relate to the jury information that you couldn't get in otherwise, unless, Mr. Navarro testified." Prior to Dr. Ortiz-Nance's testimony at trial, the trial court reiterated that Dr. Ortiz-Nance "could not simply repeat back the words and the testimony, if you will, of Navarro to him," but "[i]f it's a paraphrase and clear it's not Mr. Navarro's words, that's okay."

Navarro testified in his own defense before Dr. Ortiz-Nance testified. Navarro's testimony was that his mother was 14 years old when he was born; he never met his father and did not know what happened to his father; he and his mother and brothers moved to Mexico; his mother's boyfriend lived with them in Mexico and spanked him "with objects"; he ran away when he was 13 because of his mother's boyfriend's treatment of him; his mother got into "trouble" at some point and went to jail; his mother's boyfriend tried to molest his sister; and he later lived with his grandmother but

30.

got into trouble and ended up in a group home. Navarro testified he has had "problems getting in fights" since he was young, but did not know, most of the time, why the fights happened.

Prior to Navarro's cross-examination, Dr. Ortiz-Nance was called as a witness out of order. Dr. Ortiz-Nance testified that his evaluation of Navarro included a mental status behavioral observation, clinical interview and standardized mental status tests. He also read the police department's crime report, detention officer's hearing memo, and the probation officer's report and recommendation. Dr. Ortiz-Nance testified there was "a bit of discrepancy" between the history Navarro gave him of his relationship with his mother and the comments from Navarro's grandmother. Navarro told Dr. Ortiz-Nance his father was shot and killed while his mother was pregnant with him. Dr. Ortiz-Nance concluded, based on all the sources he considered, that Navarro had "reactive attachment disorder, avoidant type, that evolved into a history that included conduct disorder." Dr. Ortiz-Nance found that Navarro, at age 17, performed cognitively as if he were nine and a half. Dr. Ortiz-Nance described reactive attachment disorder as occurring

> "in the absence of a nurturing caregiver or presence of other traumatic events, the child might decide there's no one out there to attach to, I'm going to attach to myself. I am the only person I can trust. [¶] The world is a scary place. The world is an unsafe place, and the only person who is going to get me through it is me.… [¶] … [¶] Reactive attachment is when the child feels their world is not a safe place, it is a scary place, so they have learned to rely on themselves and themselves alone. They become hypervigilant, very controlling. [¶] They become extremely afraid of any situation, say, novel situations, something that they're called on to predict, something that is not part of their everyday world. [¶] All of these can turn this child into a child that can be very untrusting, a child that is very manipulative. A child that believes, I need to get mine before you get yours because I know that's what you're going to do. So I'm going to get mine regardless of what happens to you."

Dr. Ortiz-Nance testified that Navarro and his siblings were exposed to physical violence from an early age, specifically at the hands of his mother's boyfriend. Dr. Ortiz-

31.

Nance opined that Navarro picked up his aggressive qualities by leaving home at an early age and having to fend for himself.

On cross-examination, the prosecutor referred to the variety of sources Dr. Ortiz-Nance used in forming his opinion, including the fact that Navarro moved out at an early age, information received from Navarro's grandparents, and standardized tests. The prosecutor then asked:

> "Q: In your evaluation of the defendant, did you consider his grandmother's characterization that the defendant had been extremely disrespectful, verbally abusive, threated to physically harm her, his grandfather, and other family members if he didn't get his way?
>
> "A: Yes.
>
> "Q: Is that consistent with reactive attachment disorder?
>
> "A: Yes.
>
> "Q: During your evaluation, did you also consider his termination in April of 2007 from a group home in Fresno for noncompliance, making threatening comments to staff and for the safety of others?
>
> "A: Yes."
>
> The following exchange then took place outside the presence of the jury:
>
> "[Defense Counsel]: I object to the line of questioning with respect to the hearsay statements she's attempting to enter through the doctor by asking him statements the People made that are taken out of probation reports and things. I was specifically told not to get into that sort of think in terms of avoiding statements by the defendant.
>
> "THE COURT: I tend to agree. [¶] Ms. Wise?
>
> "[Prosecutor]: All right. My understanding was the hearsay statements of the defendant.
>
> "THE COURT: I think the hearsay, they're hearsay. What he can't do in terms of answering the question is parrot back alleged facts as if they are true for the jury's consideration. [¶] I am going to sustain the objection.

"[Defense counsel]: I would ask to strike the last two questions and answers.

"THE COURT: It's stricken."

At the request of defense counsel, the trial court then admonished the jury, "As a result of the last conference, you are directed not to consider either the last two questions or the last – the answer to the last two questions. They have been stricken and not part of the evidence of the case."

*Applicable Law and Analysis*

Navarro now contends prosecutorial misconduct in cross-examination of Dr. Ortiz-Nance denied him a fair trial in violation of his rights under the Fifth, Eleventh, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the California Constitution.

Before addressing Navarro's contention, we first question the trial court's ruling that the prosecutor's line of questioning of Dr. Ortiz-Nance violated the hearsay rule. It is the long-standing rule in California that experts may rely upon and testify to the sources on which they base their opinions (§§ 801, 802), including hearsay of a type reasonably relied upon by professionals in the field, including mental health experts. (§ 801, subd. (b); *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619; *People v. Campos* (1995) 32 Cal.App.4th 304, 307-308.) This is so because hearsay relied upon by experts in formulating their opinions is not testimonial as it is not offered for the truth of the facts stated but merely as the basis for the expert's opinion. (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210.)

Of course, any material that forms the basis of an expert's opinion testimony must be reliable and a trial court "'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.'" (*People v. Gardeley, supra,* 14 Cal.4th at p. 619; *People v. Price* (1991) 1 Cal.4th 324, 416.)

33.

Even assuming in this case that the hearsay relied upon by Dr. Ortiz-Nance was unreliable and that the trial court was correct in its ruling, we find no misconduct on the part of the prosecutor in eliciting the answers from Dr. Ortiz-Nance.

As explained in *People v. Earp* (1999) 20 Cal.4th 826, on claims of prosecutorial misconduct, our state law standards differ from those under the federal Constitution. With respect to the latter, conduct by the prosecutor constitutes misconduct only if it "'"'"so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citations.]'" (*People v. Earp, supra,* at p. 858; *Darden v. Wainwright* (1986) 477 U.S. 168, 181; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642; accord, *People v. Morales* (2001) 25 Cal.4th 34, 44.) By contrast, our state law considers it misconduct when a prosecutor uses "'"'"deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'"'" (*People v. Earp, supra,* at p. 858; accord, *People v. Morales, supra,* at p. 44.) One such means is "eliciting or attempting to elicit inadmissible evidence" in defiance of a court order. (*People v. Crew* (2003) 31 Cal.4th 822, 839.) In addition, a prosecuting attorney may not interrogate witnesses solely "for the purpose of getting before the jury the facts inferred therein, together with the insinuations and suggestions they inevitably contained, rather than for the answers which might be given." (*People v. Hamilton* (1963) 60 Cal.2d 105, 116, overruled on other grounds in *People v. Morse* (1964) 60 cal.2d 631, 648-649.) However, "[a] defendant's conviction will not be reversed for prosecutorial misconduct" that violates state law, "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew, supra,* 31 Cal.4th at p. 839.)

Navarro cites the questions posed to Dr. Ortiz-Nance as misconduct, claiming it placed before the jury evidence the prosecutor had outside the record that showed Navarro habitually threatened others with harm, was dangerous and was inclined to violence. We have considered this contention and conclude it did not "'"'"so infect[] the trial with unfairness as to make the resulting conviction a denial of due process'"'"'" in

34.

violation of the federal Constitution. (*People v. Earp, supra,* 20 Cal.4th at p. 858; *Darden v. Wainwright, supra,* 477 U.S. at p. 181.) Nor do we find the prosecutor's conduct constituted prosecutorial misconduct under state law, as explained below.

We conclude that, even if the questions of which Navarro complains were misconduct on the part of the prosecutor, they could not have contributed to the verdict and were harmless in light of the evidence of Navarro's guilt. (See *People v. Hardy* (1992) 2 Cal.4th 86, 173.) The asserted instance of misconduct was not of such severity that it resulted in an unfair trial in violation of Navarro's state constitutional rights. (*People v. Edwards* (2013) 57 Cal.4th 658, 735.) Even if the prosecutor's reference to the extrajudicial statement from Navarro's grandmother and the other group home were truly inflammatory, they paled in comparison to the inflammatory nature of the charged offense. And Navarro himself had already testified that he had "problems getting into fights" throughout his life and that he was in a group home because he "had a little problem" while living with his grandmother. The jurors were also aware that Navarro told Detective Brown he had been previously convicted of misdemeanor resisting arrest, that he had been in juvenile hall for three months, and that he had been arrested for hitting someone in the head while he was in a different group home.

Finally, in concluding that any misconduct that occurred was not prejudicial, we also note that the trial court sustained defense counsel's objection and admonished the jury not to consider the questions. We presume the jury followed the trial court's admonition to disregard the questions and answers. (*People v. Edwards, supra,* 57 Cal.4th at p. 735.)

## V. DID THE TRIAL COURT ERR WHEN IT ALLOWED DETECTIVE BROWN TO EXPRESS AN EXPERT OPINION REGARDING BLOOD DEPOSITS?

Navarro objected below that Detective Brown did not qualify as a blood spatter expert witness, and he contends on appeal that the trial court erred by allowing Detective Brown to so testify. We disagree.

35.

*Procedural Background*

In response to Navarro's objection in limine that Detective Brown did not have sufficient expertise to "offer[] an expert opinion regarding blood spatter evidence," a section 402 hearing was held. At the hearing, Detective Brown described his training and experience as follows:

> "The formal training I had is as part of my homicide course I attended an 8 hour, 80-hour course but 8 hours of it is dedicated to blood spatter identification and analysis. That training basically consisted of learning terminology and then doing practical application where the trainer used human blood and set up a room to demonstrate different types of patterns and directional spatter and the different type of velocity for investigators to determine, to be able to read the blood evidence that they're seeing and make a determination if it has any significance to their case."

Detective Brown further stated he had been to "hundreds of crime scenes … where there's blood involved," and that he had "the opportunity to view and see the different types [of blood deposits] and then attend training where [he] was able to take that training and go back and say this is what [he] saw. [¶] … [¶] And this is what it is."

The trial court agreed with Navarro that Detective Brown was not qualified "to offer an opinion as to, quote, where the overall fight started by looking at a specific piece of blood splatter." But it did find that Detective Brown "certainly has the expertise" to offer an opinion about "force, velocity, direction of a blood splatter that he observed himself." The trial court also found Detective Brown qualified to offer an opinion about "where [Detective Brown] believe[s] Mr. Jimenez first started bleeding" and about the subsequent progression of "where he stumbled or went to" while he was bleeding. The trial court also observed that, while Detective Brown could opine as to the location where Jimenez first started bleeding, he could not opine as to how the fight started.

Before the jury, Detective Brown explained that he had training in "the ability to look at a blood stain and figure out how it was placed there. Whether it was cast off of an object or a droplet from a body. The approximate height of which it came from. The

direction in which the source of the blood is traveling." Detective Brown stated he had seven years' experience as a detective, five of those as a homicide detective and had been to "hundreds of crime scenes" involving blood.

Detective Brown opined that the deposits of blood in the bedroom confirmed that it had been the scene of a fight. He opined that the direction of blood deposits revealed that the source of the blood started in the bedroom before traveling down the hall and out of the house. And he opined that the arc of blood on the exterior wall of the house above Jimenez's body had been cast off "a hand or something that's being held in a person's hand" while "making a forward and back motion."

*Applicable Law and Analysis*

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (§ 720, subd. (a).) "Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert," (*ibid.*) and "may be shown by any otherwise admissible evidence, including his own testimony" (§ 720, subd. (b)). "[T]he qualifications of an expert must be related to the particular subject upon which he is giving expert testimony." (*People v. Hogan* (1982) 31 Cal.3d 815, 852 (*Hogan*), disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.) Consequently, "the field of expertise must be carefully distinguished and limited" (*People v. Brown* (2001) 96 Cal.App.4th Supp. 1, 37), and "[q]ualifications on related subject matter are insufficient" (*Hogan, supra,* at p. 852). Thus, "[w]hether a person qualifies as an expert in a particular case … depends upon the facts of the case and the witness's qualifications." (*People v. Bloyd* (1987) 43 Cal.3d 333, 357.) "[T]he determinative issue in each case is whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the jury in the search for truth." (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 219.)

Additionally, "[t]he trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown." (*People v. Bloyd, supra,* 43 Cal.3d at p. 357.) An appellate court may find an error regarding a witness's qualifications as an expert only if "'the evidence shows that a witness *clearly lacks* qualification as an expert ….' [Citation.]" (*Hogan, supra,* 31 Cal.3d at p. 852; *People v. Panah* (2005) 35 Cal.4th 395, 478.) Once it is established that a witness has adequate credentials to qualify as an expert, questions as to the degree of his or her expertise go more to weight of the evidence than to admissibility. (*People v. Bolin* (1998) 18 Cal.4th 297, 322; *People v. Brown, supra,* 96 Cal.App.4th at Supp. 37.)

Navarro likens his case to *Hogan*, in which the California Supreme Court held that mere observation without analysis or inquiry cannot qualify a witness as an expert. (*Hogan, supra,* 31 Cal.3d at p. 853.) In *Hogan*, the defendant was convicted of first degree murder of a woman and her son. (*Id.* at p. 820.) When the defendant surrendered to the police, he had bloodstains on his pants and shoes. (*Id.* at p. 821.) He claimed he discovered the victims and the bloodstains on his clothes were from kneeling near the victims. (*Ibid.*) At trial, a criminalist offered his expert opinion on the source of the bloodstains, testifying that some stains on the defendant's clothes were "splatters," caused by blood drops flying through the air following impact rather than by surface-to-surface contact with a blood object. (*Id.* at pp. 851-852.)

The California Supreme Court in *Hogan* concluded the trial court abused its discretion in qualifying the criminalist as an expert on the subject of the source of the bloodstains. (*Hogan, supra,* 31 Cal.3d at pp. 852-853.) The criminalist had never performed laboratory analyses to determine the source of bloodstains either in past cases or the present case. (*Id.* at p. 852.) He had received no formal education or training to make such a determination. (*Ibid.*) Several years before the case, the criminalist had viewed an exhibit, which demonstrated patterns of human blood dropped from various

heights and angles, and had read a book about flight patterns of blood. (*Ibid.*) The criminalist had also observed bloodstains at many crime scenes. (*Ibid.*) Consequently, the criminalist's qualifications "boiled down to having observed many bloodstains" and, thus, he was not qualified to render an expert opinion on the source of the blood stains. (*Id.* at p. 853.)

In contrast, the California Supreme Court in *People v. Clark* (1993) 5 Cal.4th 950, 1018-1019 (*Clark*), overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22, found no abuse of discretion in the admission of expert testimony regarding blood spatter. The court observed that "it is a matter of common knowledge, readily understood by the jury, that blood will be expelled from the human body if it is hit with sufficient force and that inferences can be drawn from the manner in which the expelled blood lands upon other objects." (*Clark, supra,* at p. 1018.) The expert witness in *Clark* had attended lectures and training seminars on the subject of blood dynamics in both California and Oregon; read relevant literature; conducted relevant experiments; and visited crime scenes where blood spatter tests were conducted. (*Id.* at pp. 1018-1019.) "The trial court reasonably concluded that the witness was qualified to assist the jury in its inquiry." (*Id.* at p. 1019.)

Navarro contends Detective Brown had no significant training or education in blood spatter. The record shows Detective Brown, who had been a detective for seven years, five of those as a homicide detective, had taken an eight-hour course at "homicide school" on blood spatter interpretation and been present at "hundreds of crime scenes" involving blood. Although Detective Brown had different, and arguably less, training and experience than the expert witness in *Clark*, it cannot be said that he so clearly lacked qualifications as an expert that it was an abuse of discretion to allow him to share his opinion with the jury. (*People v. Jones* (2012) 54 Cal.4th 1, 57.) This is especially so since Detective Brown limited his testimony to the direction of blood spatter, from which he opined that Jimenez first started bleeding in one of the bedrooms in the group home

and then continued bleeding as he exited the house. Under these circumstances, Navarro's complaints about Detective Brown's qualifications go to the weight of his testimony, not its admission. (See *People v. Chavez* (1985) 39 Cal.3d 823, 829.)

Alternatively, even if error occurred, given the weakness of Navarro's defense and the overwhelming evidence of his guilt, we hold that the error was harmless because a different result was not reasonably probable.

## VI. DID THE TRIAL COURT ERR WHEN IT ALLOWED THE ADMISSION OF E.D.'S PRIOR TESTIMONY FROM NAVARRO'S FIRST TRIAL?

Navarro contends the trial court violated the hearsay rule and the confrontation clause by finding E.D. was unavailable as a witness and allowing the prosecutor to introduce his prior testimony from the first trial without subjecting him to cross-examination at the second trial. Navarro contends E.D. was merely a "reluctant witness." Respondent contends Navarro has forfeited the issue by failing to object below. We agree with respondent.

*Procedural Background*

During the second trial, the prosecutor informed the trial court that E.D., who was called to testify, was in custody, had been transported from another county, and had expressed an intent to invoke his Fifth Amendment privilege against self-incrimination. E.D., with conflict counsel present, then appeared before the trial court. Counsel explained that, while E.D. was not charged in the current case and was not in danger of being charged, he nevertheless had charges pending in another county because of previous gang affiliation and had concerns "as to how he would be treated simply because of that."

The trial court, noting E.D. was not implicated in the current case, did not find him "unavailable" under section 240. The trial court then addressed E.D. and explained that,

40.

if he were called to testify and "refuse to answer without a qualified privilege, [the trial court] will probably warn you once or twice and find you in contempt and you will be punished …." E.D. stated he understood and that he would testify honestly the following day.

On direct examination the following day, E.D. repeatedly professed a lack of memory; he did not remember what he did before bedtime the night of the murder and did not remember an argument between Navarro and Jimenez. Reading portions of his prior testimony did not refresh his recollection.

The prosecutor then read statements E.D. had made at Navarro's first trial and asked if he recalled making them. Defense counsel objected, noting it was improper admission of testimony.

Outside the presence of the jury, defense counsel argued E.D.'s lack of memory was sincere. Defense counsel objected to the procedure used, explaining that the entire testimony was not being read into the record but only those parts choses by the prosecutor. Defense counsel suggested that, if the trial court were to find E.D. unavailable as a witness due to his refusal to testify, the trial court could excuse E.D. and have someone read all of his prior testimony to the jury.

The trial court then found that E.D. had "obviously testified inconsistently by remembering the key details of that evening at a previous court proceeding," but that it could not yet find his professed lack of memory was tantamount to a complete refusal to testify, as some failures to recollect seemed credible. The trial court advised the parties that, in order to establish a true refusal to testify, someone would "need to ask him a direct question with respect to things that went down that night which any reasonable person would be expected to remember."

41.

The prosecutor then asked E.D. what he saw out in front of the group home; whether one of the staff members was lying on the ground; and whether he saw blood on the walls, carpet and tile. To each question, E.D. responded, "I don't remember."

The trial court then excused E.D. without objection and explained to the jury that it was entirely appropriate for a witness to testify that they do not remember events, specifically those that occurred a while back and were relatively insignificant. But it also explained that it was for the trial court to determine whether someone was being intentionally evasive. The trial court explained that, based on the totality of the answers given or not given by E.D., it was the trial court's determination E.D. "was purposely not answering the questions and some but not all of the questions posed to him were answers that I believe he really did remember and was refusing to testify to." The prosecutor then had a summer law clerk read E.D.'s prior testimony from the first trial to the jury. Navarro did not object.

Throughout E.D.'s original testimony, which was read by the law clerk, E.D. repeatedly responded that he could not remember. When refreshed with a transcript of his former testimony at the preliminary hearing, E.D. was able to recall that he was watching television in the living room and went to bed; he heard arguing between Navarro and "staff" about not going to bed and Navarro wanted to continue watching television; that Navarro cussed at the staff and said he was not going to do what staff told him to; that staff was "not the boss of me"; he heard "wrestling" or "tussling" while he was asleep; he heard a car outside start and hit something; he got up and saw blood in the hallway and the front door and left the house. E.D. testified he never had trouble with Jimenez, who was never disrespectful or mean to him. On cross-examination, E.D. testified he did not know how or where the "tussling" started.

42.

*Applicable Law and Analysis*

"A defendant has a constitutional right to confront witnesses, but this right is not absolute. If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial. [Citations.] The constitutional right to confront witnesses mandates that, before a witness can be found unavailable, the prosecution must 'have made a good-faith effort to obtain his presence at trial.'" (*People v. Smith* (2003) 30 Cal.4th 581, 609, citing, among others, *Barber v. Page* (1968) 390 U.S. 719, 725.) California law and federal constitutional requirements are the same in this regard. (*People v. Smith, supra,* at p. 609.) Moreover, for the prior testimony to be admissible, the defendant must have had the opportunity to cross-examine the witness at that hearing with an interest and motive similar to that which defendant has at the hearing at which the testimony is admitted. (§ 1291, subd. (a)(2); *People v. Smith, supra,* at p. 611.) "The proponent of the evidence has the burden of showing by competent evidence that the witness is unavailable." (*People v. Smith, supra,* at p. 609.)

Section 1291 creates a hearsay exception for certain prior testimony offered against a party in a former proceeding when the declarant is "unavailable as a witness." (§ 1291, subd. (a).) A witness is defined in section 240 as unavailable where the witness is excepted or precluded on the ground of privilege; disqualified from testifying to the matter; dead or unable to attend or to testify because of an existing physical or mental illness or infirmary; absent from the hearing and the court is unable to compel his or her attendance; absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance; or

persistent in refusing to testify despite being found in contempt. (§ 240, subd. (a)(1)-(6).) In *People v. Rojas* (1975) 15 Cal.3d 540, our Supreme Court construed section 240 to express a legislative intent to deem a person unavailable if he is present in court but refuses to testify out of fear. (*Rojas, supra,* at p. 551-552.)

Navarro now contends the trial court incorrectly found E.D. unavailable to testify, as he met none of the "unavailable" criteria. We find Navarro has forfeited this issue on appeal. A proper objection on either statutory (hearsay) or constitutional (right to confrontation) grounds was necessary in order to make the complaint on appeal. (*People v. Gamble* (1970) 8 Cal.App.3d 142, 149.)

Here, not only did Navarro not object under either the hearsay rule or the confrontation clause, he invited the alleged error when he proposed avoiding piecemeal impeachment by admitting the entirety of E.D.'s prior testimony upon a finding of unavailability.

In any event, even if E.D. was not "unavailable as a witness" under section 1291, his deliberate evasive forgetfulness is an implied denial of prior statements, which creates "inconsistency in effect" and authorizes admission of the witness's statements under section 1235.[5] (See *People v. Perez* (2000) 82 Cal.App.4th 760, 764-765.)

VII.    DID THE TRIAL COURT ERR WHEN IT INSTRUCTED ON THE THEORY OF FIRST DEGREE MURDER BASED ON LYING IN WAIT?

Navarro contends the trial court erred in instructing the jury on the first degree murder by lying in wait because there was insufficient evidence to warrant such an instruction. We find no prejudicial error.

*Procedural Background*

---

[5]    "Evidence of a statement by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing …." (§ 1235.)

44.

The trial court instructed the jury on two theories of first degree murder: lying in wait and premeditation/deliberation.  As such, the trial court used CALCRIM No. 521 to instruct the jury on the two theories of first degree murder: "[o]ne, the murder was willful, deliberate, and premeditated and/or two, the murder was committed by lying in wait."  The jury was told "You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved that the defendant committed murder. All of you do not need to agree on the same theory."

Regarding the lying-in-wait theory of first degree murder, the jury was instructed as follows:

> "The defendant is guilty of first degree murder if the people have proved that the defendant murdered while lying in wait or immediately thereafter. The defendant murdered by lying in wait, if one, he concealed his purpose from the person killed; two, he waited and watched for an opportunity to [act]; and three, then, from a position of advantage, he intended to and did make a surprise attack on the person killed.  [¶]  The lying in wait does not need to continue for any particular period of time but duration must be substantial[] enough to show a state of mind equivalent to deliberation or premeditation. [¶] Deliberation means carefully weighing the considerations for and against [a] choice and knowing the consequences deciding to act.  An act is done with premeditation if the decision to commit the act is made before the act is done. [¶]  A person can conceal his purpose even if the person killed is aware of the person's physical presence. The concealment can be accomplished by ambush or other secret plan. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder, rather than a lesser crime. [¶] If the People have not met this burden, you must find the defendant not guilty of first degree murder."

_Applicable Law and Analysis_

"A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof. [Citation.]  We review the trial court's decision de novo.  In so doing, we must determine whether there was indeed sufficient evidence to support the giving of a lying-in-wait

instruction. Stated differently, we must determine whether a reasonable trier of fact could have found beyond a reasonable doubt that defendant committed murder based on a lying-in-wait theory. [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

Applying this test, we conclude that substantial evidence supports the decision to give a lying-in-wait instruction in this case. Navarro concealed his purpose from Jimenez, waited and watched for an opportunity to act, and then, from a position of advantage, made a surprise attack. This is evidenced by Navarro's own admission to Detective Brown that he was upset with Jimenez for making him go to bed, he went to his room and pulled out a knife from under his bed, and had it beside him on the bed unbeknownst to Jimenez. When Jimenez entered Navarro's bedroom, he then used the knife to stab Jimenez in the neck. Navarro's specifically stated that, when Jimenez came into his room, Jimenez did not see Navarro with the knife when he stabbed him.

In any event, any error in instructing on lying in wait was harmless. Reversal is not required so long as a valid ground for the verdict remains, "absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) When the jury has been instructed on a theory not supported by the evidence, we affirm unless "a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Id.* at p. 1130) "[I]nstruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict." (*Ibid.*) Nothing in the record here affirmatively demonstrates that the jury in fact found Navarro guilty of first degree murder based upon the lying-in-wait theory, as opposed to the theory of premeditation and deliberation. While, as Navarro notes, the prosecutor argued the lying-in-wait theory, she also argued the alternate theory of

premeditation and deliberation.  No questions were asked by the jury during deliberations that would indicate they were focused on the lying-in-wait theory.  (*Ibid.*)

Navarro's argument that it was a miscarriage of justice warranting reversal for the trial court to instruct on the theory of first degree murder based on lying in wait is without merit.

VIII.   DID THE TRIAL COURT ERR WHEN IT INSTRUCTED THE JURY ON THE PURPOSES FOR WHICH IT COULD CONSIDER EVIDENCE OF NAVARRO'S MENTAL DISORDER?

Navarro contends the trial court erred by instructing the jury that it could consider evidence of his mental disorder when determining whether he was guilty of murder, but not when determining whether the murder was of the first degree or whether he was guilty of a lesser included offense.  Even if we assume the instruction was erroneous or misleading in isolation, and that the alleged error was neither invited nor forfeited, there is no doubt in light of the jury instructions as a whole that the jury was properly instructed.

*Procedural Background*

The trial court instructed the jurors pursuant to CALCRIM No. 520 that they could not find Navarro guilty of murder unless they found he acted with malice aforethought.  The trial court instructed the jurors pursuant to CALCRIM No. 521 that they could not find murder in the first degree unless they found either that Navarro lay in wait or acted willfully, deliberately, and with premeditation.  Specifically, CALCRIM No. 521 provided: "The defendant acted *willfully* if he intended to kill.  The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.  The defendant acted with *premeditation* if he decided to kill before completing the act that caused death."  The trial court also instructed the jurors with CALCRIM Nos. 570 and 571 on the elements of the lesser offense of voluntary manslaughter based on heat of passion or imperfect self-defense.

As to evidence that Navarro had a mental disorder, the trial court instructed the jurors pursuant to CALCRIM No. 3428 that they could consider the evidence "for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime." As to the murder offense, the trial court instructed: "The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically, malice aforethought .… If the people have not met this burden, you must find the defendant not guilty of murder."

*Applicable Law and Analysis*

Navarro now contends that the trial court, in giving CALCRIM No. 3428 on the consideration of his mental disorder, failed to reiterate the intent or mental state required for the murder to have been of the first degree or to reiterate the mental elements of the lesser offense of voluntary manslaughter. Navarro's argument is that, because the trial court failed to do so, the jurors likely inferred that they could consider his mental disorder in determining whether he committed murder, but not when determining whether the murder was of the first degree or whether he was guilty of a lesser offense.

We conclude Navarro has forfeited his claim of instructional error. Navarro does not challenge the correctness of CALCRIM No. 3428. Rather, he complains that the trial court should have reiterated the mental elements of first degree murder or any lesser offense when instructing the jurors on the purposes for which they could consider evidence of his mental disorder. "'[A] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citations.]" (*People v. Jones* (2013) 57 Cal.4th 899, 969; see *People v. Livingston* (2012) 53 Cal.4th 1145, 1166.)

In any event, even assuming, arguendo, that Navarro did not forfeit this argument by agreeing to this instruction, his argument fails because, in context, the jury was

48.

properly instructed on the intent or mental state required for first degree murder and voluntary manslaughter. The trial court instructed with CALCRIM No. 3428 that the jury could consider evidence of Navarro's mental disorder when "deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime." Jurors are presumed to have correlated the reference in CALCRIM No. 3428 to "the intent or mental state" required for "the charged crime" with the mental elements of first degree murder which the court had already defined pursuant to CALCRIM No. 521 and of the lesser offense of voluntary manslaughter which the court had already defined pursuant to CALCRIM Nos. 570 and 571. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852 [jurors are presumed able to understand and correlate instructions and to have followed the court's instructions].) Considered in context, there is no likelihood that the jurors would have misunderstood CALCRIM No. 3428 as meaning they could not consider Navarro's mental disorder when determining whether the killing was manslaughter or second or first degree murder.

We reject Navarro's claim to the contrary.

IX. IS THERE CUMULATIVE PREJUDICE?

Navarro contends that, even if the alleged errors and deficiencies in his trial were individually harmless, they were cumulatively prejudicial and violated his right to a fair trial. We have either rejected Navarro's claims of error and/or found that any errors, assumed or not, were not prejudicial. Viewed cumulatively, we find that any errors do not warrant reversal of the judgment. (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

X. DID THE TRIAL COURT ERR BY FAILING TO PROPERLY CONSIDER ALL OF THE RELEVANT CIRCUMSTANCES IN SELECTING NAVARRO'S SENTENCE?

Navarro, who was convicted of first degree murder, dissuading a witness and grand theft of an automobile committed when he was 16 years old, was sentenced to a term of 31 years eight months to life in prison. Navarro contends the trial court failed to

49.

consider "a plethora of mitigating factors," all related to Navarro's youth, when selecting the length of his prison sentence. Respondent correctly notes failure to raise this issue in the trial court forfeits the claim on appeal. (See *People v. Scott* (1994) 9 Cal.4th 331, 353.) We agree, but will address the issue on the merits due to Navarro's alternate claim that counsel was ineffective for failing to raise the issue below.

*Procedural Background*

At sentencing, the trial court stated that it had received, reviewed and considered the report and recommendation from the probation officer and had read all of the written impact statements submitted. The report, written in August of 2012, stated Navarro was 16 years old (two months shy of 17), when he committed the murder; he did not know the identity of his father; he had not had contact with his mother since 2004; he last attended school when he was nine and was functioning at a fifth grade level; and Navarro stated he had no physical, medical, or mental health issues and was taking no medications. The probation officer made note of Navarro's "questionable mental condition." The report listed no factors in mitigation relating either to the crime or to Navarro. It listed numerous factors in aggravation, including the fact that Navarro was on probation at the time the crime was committed and prior performance on probation was unsatisfactory. It also stated the manner in which the crime was committed indicated planning, sophistication or professionalism.

At sentencing, defense counsel acknowledged the 25-year term for murder was "statutorily command[ed]," but asked that the midterm of three years rather than the maximum term of four years be given for dissuading a witness.

Following in-court statements by numerous Jimenez relatives, the trial court explained its sentencing determination as follows:

> "In addition to considering those comments made by the parties, the comments that were made in the written statements, the report of the Probation Department, I have specifically and particularly considered those factors in aggravation and in mitigation identified in the report by

50.

probation. It is clear that the number and the types of factors in aggravation in this case completely outweigh any factors in mitigation. In fact, I am unable to identify a single factor in mitigation that either applies to this defendant or applies to the circumstances of this case. And those factors are adopted by me in consideration of this sentence.

"I am aware that all crimes of this type are absolutely senseless, however, this one was senseless beyond description. I recall the evidence was that Mr. Jimenez was stabbed 92 times and I cannot for the life of me figure out any meaning or explanation for that kind of conduct.

"In those factors in aggravation the one that caught my attention and holds my attention now is the complete lack of any remorse expressed by Mr. Navarro at any time in the proceedings but especially at this juncture."

Navarro did not object to the trial court's reasoning.

The trial court then sentenced Navarro to an aggregate terms of 31 years eight months to life in prison. The aggregate term consisted of an indeterminate term of 25 years to life in prison for the first degree murder; a principal determinate term of four years for the witness dissuasion; a consecutive subordinate term of eight months for grand theft of an automobile; and two consecutive enhancements of one year each for the personal use of a deadly weapon in commission of the murder and the witness dissuasion.

*Applicable Law and Analysis*

Navarro contends trial counsel was ineffective for failing to object to the trial court's finding that there were no circumstances in mitigation. Specifically, he contends, pursuant to *Miller v. Alabama* (2012) 567 U.S.___ [132 S.Ct. 2455, 2469], the trial court failed "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." In homicide cases, the trial court is obliged to consider the distinctive attributes of youth before sentencing the defendant to a prison term that does not include a meaningful opportunity to obtain release. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1361; *Miller v. Alabama, supra,* at p. 2469.)

Here, however, reasonable defense counsel should have assumed the trial court, after presiding over Navarro's trial and considering the probation report, was well aware of Navarro's age, the evidence of his mental development and disorder, and the evidence of his troubled childhood. From this, we conclude the trial court considered the relevant mitigating factors before imposing sentence. Reasonable counsel could also have accepted the trial court's finding that Navarro's age and surrounding circumstances did not mitigate his culpability.

Moreover, Navarro's sentence of 31 years eight months to life in prison (for which he had already served five years) did provide for a meaningful opportunity for release. In addition, because Navarro was under the age of 18 when he committed the offense, he "shall be eligible for release on parole … during his … 25th year of incarceration at a youth offender parole hearing." (Pen. Code, § 3051, subd. (b)(3).)

Furthermore, even if defense counsel performed deficiently and even if the trial court failed to consider all relevant circumstances in mitigation, it is not reasonably probable the trial court would impose a lesser sentence on remand. (*People v. Coelho* (2001) 89 Cal.App.4th 861, 889-890; *People v. Williams* (1996) 46 Cal.App.4th 1767, 1782-1783.) The trial court described the murder as "senseless beyond description" and that "the number and types of factors in aggravation in this case completely outweigh any factors in mitigation." The trial court adopted the probation officer's opinion that Navarro committed the murder in a manner that indicated planning, sophistication, or professionalism; that he engaged in violent conduct indicting a serious danger to society; that he committed the offenses while on juvenile probation; that his performance on probation had been unsatisfactory; that the crimes were predominantly independent of each other; and that the physical and temporal distance between his crimes indicated more than one period of aberrant behavior. As a result, it is "virtually certain" the trial court would impose the same sentence on remand. (*People v. Coelho, supra,* at p. 890.)

We reject Navarro's claim that he is entitled to a new sentencing hearing.

52.

## XI. DID THE TRIAL COURT VIOLATE THE RULE AGAINST DOUBLE JEOPARDY WHEN IT INCREASED NAVARRO'S AGGREGATE PRISON SENTENCE?

Navarro contends the trial court violated the rule against double jeopardy by increasing his aggregate prison sentence following his successful petition for writ of habeas corpus.  We disagree

*Procedural Background*

After Navarro's first trial, the trial court sentenced him to an aggregate term of 30 years eight months to life in prison; an indeterminate term of 25 years to life for the first degree murder; a principal determinate term of four years for witness dissuasion; a consecutive one year enhancement for the personal use of a deadly weapon in the commission of witness dissuasion; and a consecutive subordinate term of eight months for automobile theft.  Although the jury found true that Navarro also used a deadly weapon in the commission of the murder, pursuant to Penal Code section 12022, subdivision (b)(1), the trial court did not impose the corresponding enhancement, stating, "There is no one-year enhancement pursuant to 12022 …. That's already been imposed."

At sentencing after Navarro's second trial, the trial court imposed an aggregate term of 31 years eight months to life in prison, consisting of the same sentence components as it had at the first trial, except that it imposed a one-year enhancement under Penal Code section 12022, subdivision (b)(1), for Navarro's personal use of a deadly weapon in the murder as well.

*Applicable Law and Analysis*

As a general rule, "[w]hen a defendant successfully appeals a criminal conviction, California's constitutional prohibition against double jeopardy precludes the imposition of more severe punishment on resentencing."  (*People v. Hanson* (2000) 23 Cal.4th 355, 357.)  But the general rule does not apply when a trial court pronounces an unauthorized sentence.  Instead, "'[s]uch a sentence is subject to being set aside judicially and is no bar to the imposition of a proper judgment thereafter, even though it is more severe than the

original unauthorized pronouncement.'" (*Id.* at p. 360, fn. 3.) An unauthorized sentence is subject to judicial correction whenever the error comes to the attention of the trial or reviewing court. (*People v. Serrato* (1973) 9 Cal.3d 753, 763, overruled on another ground in *People v. Fosselman* (1983) 33 cal.3d 572, 583, fn.1.)

Contrary to Navarro's assertion, the trial court's failure at his first trial to impose the enhancement for his personal use of a deadly weapon in the commission of the murder did not prohibit the trial court from imposing the enhancement at the second trial. This is so because the trial court's failure to impose the Penal Code section 12022, subdivision (b)(1) personal knife use on enhancement on the murder at the first trial was unauthorized and subject to correction at any time. Penal Code section 12022, subdivision (b)(1), provides that a defendant who uses a deadly weapon in the commission of a felony "shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense." The use of a weapon is not an element of first degree murder, of which Navarro was convicted. (Pen. Code, § 189.)

Although the trial court at the first trial stated it had already imposed an enhancement for Navarro's use of a weapon in the commission of the witness dissuasion, there is nothing in Penal Code section 12022 to suggest that a court may impose the enhancement only once if the defendant used the same weapon in the commission of multiple offenses on multiple victims. The trial court therefore failed to impose the section 12022, subdivision (b)(1) personal knife use enhancement on the murder, making the sentence unauthorized and subject to correction. (*People v. Irvin* (1991) 230 Cal.App.3d 180, 190.)

The trial court's failure at the first trial to impose the enhancement for Navarro's person use of a deadly weapon in the commission of the murder did not prohibit the trial court from correcting its error in imposing the enhancement at the second trial, and we reject Navarro's claim to the contrary.

XII. DID THE TRIAL COURT VIOLATE THE RULE AGAINST DOUBLE JEOPARDY WHEN IT INCREASED THE RESTITUTION FINE BUT NOT THE VICTIM RESTITUTION ORDER?

Navarro contends his right to protection against double jeopardy was violated when, after retrial, a greater amount of restitution was imposed than had been after his first trial. Respondent concedes that the trial court erred by increasing the restitution fine under Penal Code section 1202.4, subdivision (b), and newly imposed, but stayed, matching parole revocation restitution fine under Penal Code section 1202.45. But respondent disagrees that the trial court violated double jeopardy by increasing the restitution order payable directly to the victim under Penal Code section 1202.4, subdivision (f). We agree with respondent.

*Procedural Background*

At Navarro's initial sentencing on January 8, 2009, the probation officer filed a report stating State Fund Insurance gave the Jimenez family $10,547.39 for funeral expenses and the Victim Compensation Government Claims Board had given the family another $1,952.61 in assistance. The probation officer did not have information about additional expenses the family might have incurred as a result of the murder, about expenses K.J. might have incurred as a result of witness dissuasion, or about expenses the group home might have incurred as a result of the automobile theft. The trial court ordered Navarro to pay restitution of $2,000 pursuant to Penal Code section 1202.4, subdivision (b); and the amounts identified in the probation report as to the murder and in an amount to be determined later as to the witness dissuasion, pursuant to Penal Code section 1202.4, subdivision (f). A parole revocation restitution fine under Penal Code section 1202.45 was not imposed, the trial court noting, "[t]here is no 1202.45 since this is a life crime," despite the fact that both the determinate and indeterminate portions of Navarro's sentence included opportunity for parole.

On August 29, 2012, at Navarro's sentencing after retrial, and in response to a new probation report, the trial court ordered Navarro to pay restitution in the amount of

$10,000 pursuant to Penal Code section 1202.4, subdivision (b); and $12,547.39 to the Jimenez family (which now included an additional $2,000 for a headstone) and $1,952.61 to the Victim's Compensation Government Claims Board pursuant to Penal Code section 1202.4, subdivision (f). It also imposed and stayed a $10,000 restitution revocation fine pursuant to Penal Code section 1202.45.

*Applicable Law and Analysis*

When a jury convicts a defendant of committing a criminal offense, the trial court is generally obligated to order the defendant to pay restitution directly to his or her victims pursuant to Penal Code section 1202.4, subdivision (f). (Pen. Code, § 1202.4, subd. (a)(3)(B); see *People v. Villalobos* (2012) 54 Cal.4th 177, 180-181; *People v. Giordano* (2007) 42 Cal.4th 644, 651-652.) Such an order "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct .…" (Pen. Code, § 1202.4, subd. (f)(3).) "The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so and states them on the record." (Pen. Code, § 1202.4, subd. (f).) "If the amount of loss cannot be ascertained at the time of sentencing, the restitution order shall include a provision that the amount shall be determined at the direction of the court." (*Ibid.;* see Pen. Code, § 1202.46.) After the trial court imposes a restitution order, the order "shall be enforceable as if the order were a civil judgment." (Pen. Code, § 1202.4, subd. (i).)

In additional to ordering a convicted defendant to pay restitution directly to his or her victims, a trial court is generally obliged to order the defendant to pay a "restitution fine" pursuant to Penal Code section 1202.4, subdivision (b). (Pen. Code, § 1202.4, subd. (a)(3)(A).) "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense." (Pen. Code, § 1202.4, subd. (b)(1).) A restitution fine, unlike a restitution order, is deposited in the State Treasury Restitution Fund, from which crime victims may obtain compensation through an application

56.

process.  (*People v. Villalobos, supra,* 54 Cal.4th at p. 181; *People v. Giordano, supra,* 42 Cal.4th at p. 651.)

If the defendant's sentence includes a period of parole, Penal Code section 1202.45 provides that the trial court must impose "'an additional parole revocation restitution fine in the same amount as' the restitution fine under [Penal Code] section 1202.4, subdivision (b)."  (*People v. Villalobos, supra,* 54 Cal.4th at p. 181.)  The parole revocation fine is also paid into the state Restitution Fund, and the fine is suspended unless the person's parole is revoked.  (*Ibid.*)

Navarro contends, and respondent concedes that the trial court erred by increasing the restitution fine under Penal Code section 1202.4, subdivision (b), from $2,000 to $10,000.  "When a defendant successfully appeals a criminal conviction, California's constitutional prohibition against double jeopardy precludes the imposition of more severe punishment on resentencing."  (*People v. Hanson, supra,* 23 Cal.4th at p. 357.)  "[A] statutorily mandated restitution fine comes within" the double jeopardy rule that "precludes the imposition of more severe punishment on resentencing."  (*Ibid.*)  This is so because "the Legislature intended restitution fines as a criminal penalty rather than as a civil remedy."  (*Id.* at p. 362.)  Here, the increase of the restitution fine pursuant to Penal Code section 1202.4, subdivision (b) at Navarro's second trial, following his successful petition for writ of habeas corpus, was in error and the amount is to be reduced to the original amount of $2,000.  The matching stayed parole revocation fine, pursuant to Penal Code section 1202.45, which should have been and was not imposed after the first trial, should also be reduced to $2,000, to match that of the Penal Code section 1202.4, subdivision (b) restitution fine.

Navarro also contends the victim restitution order must be reduced; respondent disagrees, as do we.  Although the double jeopardy clause applies to increases in restitution fines, victim restitution or restitution orders are qualitatively different from restitution fines, and the double jeopardy clause does not apply.  (*People v. Harvest*

(2000) 84 Cal.App.4th 641, 647 (*Harvest*); see also *People v. Moreno* (2003) 108 Cal.App.4th 1, 11.)

Navarro relies on *People v. Daniels* (2012) 208 Cal.App.4th 29 (*Daniels*), for the proposition that his total restitution can be no more than $14,500, which is the aggregate amount of restitution imposed after Navarro's first trial. In *Daniels*, the defendant's conviction was reversed on appeal, he was retried, and reconvicted. (*Id.* at p. 31.) After his first trial, the defendant was ordered to pay $3,400 in restitution, consisting of direct victim restitution in the amount of $3,000 (Pen. Code, § 1202.4, subd. (f)); a $200 restitution fine (Pen. Code, § 1202.4, subd. (b)); and a stayed $200 parole revocation restitution fine (Pen. Code, § 1202.45). (*Daniels, supra,* at p. 31.) At sentencing after retrial, he was ordered to pay restitution in the amount of $10,000, consisting of $5,000 restitution fine and a stayed $5,000 parole revocation restitution fine, but no direct victim restitution. (*Ibid.*) The court held that the new restitution amount violated the prohibition against double jeopardy and, on remand, directed the trial court to order no more than $3,400 in restitution. In doing so, the *Daniels* court held that "an increase in one component of a monetary sentence will not render punishment more severe if another component is reduced by an equal amount. The protection against double jeopardy requires only that the aggregate monetary sentence, not each component thereof, be equal to or less than that originally imposed." (*Id.* at p. 32.)

*Daniels*, however, did not consider the converse issue of whether the double jeopardy clause would allow a trial court to increase a restitution order following a successful appeal only if there is a corresponding decrease in the restitution fine. Nothing in *Daniels* refutes any authority holding that restitution orders are not a form of punishment. Nor did *Daniels* acknowledge or address the specific holding in *Harvest* that restitution orders are outside the scope of the double jeopardy clause. We find Navarro's reliance on *Daniels* unpersuasive.

Since the direct victim compensation provisions of Penal Code section 1202.4, subdivision (f), are not criminal penalties barred by the double jeopardy provisions of the state and federal Constitutions, we reject Navarro's argument that the trial court could not increase the amount of victim restitution after his successful writ of habeas corpus.

XIII.   IS NAVARRO'S CONVICTION ON THE IN PRISON ASSAULT TIME BARRED?

Finally, Navarro claims the trial court did not have jurisdiction to convict him of the jail assault, case No. VCF217254A because the charge was time barred by the statute of limitations.  Respondent contends Navarro's claim is not cognizable because he did not obtain a certificate of probable cause after pleading nolo contendere.  We agree with respondent.

*Procedural Background*

In case No. VCF217254A, Navarro was charged by complaint with a felony violation of Penal Code section 245, subdivision (a)(1).  The offense was alleged to have occurred on or about January 16, 2009.  A complaint was filed in Tulare County Superior Court on February 13, 2009.

Penal Code section 245, subdivision (a)(1), is punishable "by imprisonment in the state prison for two, three, or four years."  (Pen. Code, § 245, subd. (a)(1).)  The applicable statute of limitations, Penal Code section 801, provides that an offense punishable in state prison shall be commenced within three years after commission of the offense.

On May 22, 2012, Navarro was returned to Tulare County from state prison for retrial of case No. VCF187188, his commitment offense.  On May 23, 2012, more than four months after the three-year limitations period elapsed, Navarro was arraigned on the jail assault complaint.

Navarro pleaded nolo contender in that case on June 18, 2012.  He failed to request or receive a certificate of probable cause from the superior court.  Navarro later

59.

asked this court for leave to file an otherwise untimely request for a certificate of probable cause, which was denied without prejudice on April 17, 2013. He did not renew his request thereafter.

*Applicable Law and Analysis*

We find Navarro's claim procedurally barred. Penal Code section 1237.5 provides that "[n]o appeal shall be taken by the defendant from a judgment of conviction upon a plea of guilty or nolo contendere" unless "[t]he trial court has executed and filed a certificate of probable cause for such appeal with the clerk of the court." (Pen. Code, § 1237.5, subd. (b).) Navarro neither sought nor procured a probable cause certificate from the trial court.

It is true that the statute of limitations is jurisdictional and the lack of jurisdiction may be raised for the first time on appeal. (*People v. Chadd* (1981) 28 Cal.3d 739, 757.) However, as this court has explained, "[t]hat the statute of limitations is jurisdictional does not mean that the issue may be raised on appeal *without compliance with Penal Code section 1237.5.*" (*People v. Smith* (1985) 171 Cal.App.3d 997, 1001, original italics.) After all, among the grounds for which Penal Code section 1237.5 requires a probable cause certificate are "jurisdictional … grounds going to the legality of the proceedings." (Pen. Code, § 1237.5, subd. (a).)

Navarro's statute of limitations contention is not cognizable on this appeal.

## DISPOSITION

The judgment of conviction and prison sentence are affirmed, but the restitution fine pursuant to Penal Code section 1202.4, subdivision (b) and the stayed parole revocation restitution fine pursuant to Penal Code section 1202.45 are each reduced to $2,000. The trial court is directed to prepare an amended abstract of judgment in accordance with this disposition and deliver it to the Department of Corrections.

_____

FRANSON, J.

WE CONCUR:

_____

KANE, Acting P.J.

_____

POOCHIGIAN, J.